[Civ. No. 9131. Fourth Dist., Div. One. Jan. 14, 1969.]

ROBERT L. CONNELL et al., Plaintiffs and Appellants, v. WILLIAM ABI ZAID et al., Defendants and Respondents.

---

Thompson & Thompson and David R. Thompson for Plaintiffs and Appellants.

White, Price, Froehlich & Peterson, Paul A. Peterson and Arlington Ray Robbins for Defendants and Respondents.

LAZAR, J. pro tem.*—Plaintiffs appeal from a judgment of dismissal after order sustaining defendants' general demurrer to the first and second causes of action without leave to amend.

Plaintiffs purchased certain real property encumbered, at the conclusion of the purchase, by four promissory notes each secured by a deed of trust against the subject property. Defendants, as assignees of the original sellers, are owners of the fourth note and deed of trust. Defendants' deed of trust contained the following language, expressly called to defendants' attention at the time of the assignment:

" 'Sellers agree to and hereby do subordinate their second, third, and/or fourth note to refinancing by the BUYERS of the existing first, second, and/or third notes, and will accept a second and/or third note with payments indicated until the existing first, second, and/or third notes are paid in full, except that within a six months period after the combined unpaid balances of the existing first, second, and/or third note have been reduced to $50,000.00, when a payment of $50,000.00 must be made on the unpaid balance of the SELLER's [sic] second, third and/or fourth note, whichever. When SELLERS' second, third, and/or fourth note has been reduced to the amount of $50,000.00, the monthly payment on the SELLERS' balance shall be increased to $900.00 including 7%' ".

When plaintiffs purchased the property in December 1961 the total encumbrance of the first, second and third deeds of trust was about $150,000 with aggregate monthly payments of $2,085 required. In August 1967 defendants' note and deed of trust had increased in balance, the manner unexplained, from $160,975.79 to $170,675.79. The total balance due on the three senior deeds of trust as of the commencement of the lawsuit

---

*Assigned by the Chairman of the Judicial Council.

is not stated in the complaint. At the August date plaintiffs desired to refinance the first, second and third deeds of trust by a new first deed of trust in the principal sum of $131,000, payable monthly at $1,063.40 per month. Defendants refused to sign for the purposes of a loan escrow opened by plaintiffs a so-called "Subordination Agreement" which admittedly would have constituted written acknowledgment by defendants of the priority of the substituted $131,000 encumbrance.

Plaintiffs' first cause of action sought relief in the nature of specific performance to require defendants to execute the "Subordination Agreement." The second cause of action sounded in declaratory relief upon the same facts, praying judgment that the new loan would be superior without the necessity of defendants' execution of any subordination agreement.

We first observe that no special demurrer is involved although the ground of failure separately to state causes of action (due to an alternative demand for damages as to the first cause of action) was asserted in the demurrer as filed. The posture of the case on appeal does not require that we consider that aspect of the pleadings.

We are required to consider the trial court's determination that plaintiffs have not pled facts which could entitle them to some form of relief. On the one hand no factual dispute is raised because of the well-known concomitant of a general demurrer that all facts well pled are admitted; on the other hand it is impossible to avoid making a factual determination involving the meaning of the critical contractual language of the parties in deciding which party should prevail. Put another way the trial court could not be justified in ruling as it did without a valid determination that the subordination-refinancing provision of the fourth deed of trust could have but one interpretation as a matter of law. We are unable to agree under the circumstances that such is possible.

Defendants contend that the refinancing provision in question must be construed as if it were a conventional "subordination" agreement; that so considered it must be deemed so uncertain and inequitable as to be an insufficient basis for specific performance (*Handy* v. *Gordon,* 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329]); that since the specific performance cause of action is demonstrably beyond the reach of plaintiffs the declaratory relief cause of action must likewise fall as it is based on identical facts.

An obvious difficulty with defendants' argument at this point (since we are concerned only with the pleading of plaintiffs' case) is that the language upon which plaintiffs rely does not, on its face, lend itself to defendants' theory. The key word in the critical language is "refinancing." Conventional "subordination" relates to the situation of new money coming in for development and improvement of the land. An encumbrance not previously in existence is created which usurps the priority of the encumbrance required to be "subordinate." To subordinate is to lose position—to give up a better for a worse status.

The provision we are discussing speaks of refinancing with respect to encumbrances having a priority from the inception of the financial arrangements for the purchase of the property. The agreement on its face suggests not a subordination, although the word "subordinate" is used, but, a consolidation of superior encumbrances into a lesser number or a substitution of one or more encumbrances for those already existing without disturbing the relative standing of the security interests. Such would not be a usual practice (California Land Security and Development (Cont.Ed. Bar) §§ 5, 6, p. 128), but it is not difficult to apprehend the process as one which could result to the advantage of the inferior security interest (Cf., *Western Fruit Growers, Inc.* v. *Security Title etc. Co.*, 20 Cal.App.2d 150 [66 P.2d 742]). Substitution and subordination are not necessarily the same except in the sense that each must be founded upon agreement of the parties.

The language quoted from the fourth deed of trust is at best ambiguous and at worst incomplete. The reading of it immediately poses questions of fact or of mixed fact and law before it can be known what the contract is and whether it is enforceable. With respect to the entire provision we are faced from the very start with the question what does the language mean, what did the parties intend, how were their objectives to be achieved? Implicit in the formal words of the agreement is the implication that there must have been between the parties other agreements supplementary to the written agreement, not in derogation but in implementation or construction. A parallel situation was recognized in *United States Building & Loan Assn.* v. *Salisbury,* 217 Cal. 35, 41 [17 P.2d 140], in the context of foreclosure and trial as against specific performance and pleading, in language relevant to the instant

problem: "The instrument is sufficiently ambiguous and doubtful in meaning to admit of extrinsic evidence. But in the absence of evidence as to the intent of the parties, we cannot add to the instrument by implication, but must adhere to the literal terms of the priority provision. The decision of the trial court for plaintiff must be reversed. Upon a retrial, plaintiff may offer evidence of the circumstances surrounding the execution of the deed of trust and the placing of the restrictions on the priority provision, with a view to establish the intent of the parties that the restriction as to building did not apply to a loan of $20,000 or less."

In view of the uncertainties and lack of definition which we have barely suggested, we see no reason to labor the various possibilities of contractual understanding which could have existed at the time the fourth deed of trust was created. It is sufficient to point out our beilef that the case at this point in principle comes within the following language from *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 38-40 [69 Cal.Rptr. 561, 442 P.2d 641]: "In this state, however, the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used. Accordingly, the exclusion of relevant, extrinsic, evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone.

"If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however, do not have absolute and constant referents. 'A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . .' (Citation.) The meaning of particular words or groups of words varies with the '. . . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.' (Citation.) Accordingly, the meaning of a writing '. . . . can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words

do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended. [Citations omitted.]' (Citations.)

"Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding.

"Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. (Citations.) Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' (Citations.)"[1]

In view of the necessity of first determining what is the contract between the parties, the declaratory relief action could well have the result of demonstrating a contract between the parties which would be enforceable in favor of plaintiffs. Rather than a situation in which the declaratory relief action must fall because of the exigencies of the specific performance cause, the case may be one in which the specific performance cause may possibly be given life by the outcome of the declaratory relief cause.

■ ■ It is the general rule that if an instrument is ambiguous the party pleading is required to set forth the meaning of the writing. (See 2 Witkin, Cal. Procedure (1954) Pleading, § 256, p. 1231.) The meaning attributed to the writing must be one to which it is reasonably susceptible (*Coast. Bank* v. *Minderhout*, 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]), and where "a pleaded instrument is, because of the uncertainty of the language in which it is expressed, susceptible of more than one construction *as to its nature or as to*

[1]We observe, in fairness to the trial court, that the ruling in the instant case was made long before the opinion was issued in *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage & Rigging Co., supra,* 69 Cal.2d 33.

*the purpose intended by the parties to be attained by it,* [Italics ours] the construction of the party pleading it should be accepted, if such construction be reasonable'' in considering a pleading attacked by general demurrer. (*Richards* v. *Farmers etc. Bank,* 7 Cal.App. 387, 395 [94 P. 393].)

In *Durkee* v. *Cota,* 74 Cal. 313, it was said at page 315 [16 P. 5] : ''Whether or not the contract is so uncertain that it could not be interpreted by the aid of surrounding circumstances, to be proved by evidence, need not be determined. It is evident that the covenant is ambiguous. For what purpose was the water right to be 'full and abundant?'—for any particular purpose, or for all purposes which the fancy of the plaintiff might suggest? The pleading does not enlighten us on this point. It simply sets out a copy of the contract, leaving it to speak for itself. It is obvious that the pleading must partake of whatever ambiguity there is in the contract. It is perfectly proper to set out a contract *in haec verba.* But in such case, if the contract is uncertain, the pleader must put some definite construction on it by averment.''

This language applies to this case and demonstrates that plaintiffs should have been permitted an opportunity to amend as they requested.

The judgment is reversed, with directions that the order sustaining defendants' demurrer be modified to allow plaintiffs to amend their complaint.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied January 30, 1969, and respondents' petition for a hearing by the Supreme Court was denied March 12, 1969. Mosk, J., was of the opinion that the petition should be granted.